UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| DENNIS GLENN HIGGINS, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. 12-3072 ) |
| BURLINGTON NORTHERN and SANTA FE RAILROAD COMPANY, a corporation, | ) ) ) ) |
| Defendant. | ) ) |

# O R D E R

This matter is now before the Court on Defendant BNSF's Motion for Summary Judgment. For the reasons set forth below, the Motion [31] is GRANTED.

### BACKGROUND

This action is brought pursuant to the Federal Employers' Liability Act, 45 U.S.C. §§ 51-59. Plaintiff, Dennis Higgins ("Higgins") was born on September 26, 1950. He began working as a laborer for BNSF in 1977 and after a year, switched to the position of machinist for the remainder of his employment. As a machinist, Higgins generally serviced locomotives, repaired damage to rail cars, and replaced parts. From 1986 to 1996, he worked in the Galesburg, Illinois diesel shop. In 1996, he went to the West Burlington, Iowa show, where he worked until returning to Galesburg in 2005 or 2006. When he returned to Galesburg, Higgins worked in the diesel pit, working on brake shoes, changing oil, and checking for leaks in the locomotives. After some period of time, he switched to the "ready side," where he hooked up locomotives, did air tests on locomotives, and got outbound locomotives ready for departing trains.

Higgins and Steven Heckenberg ("Heckenberg") worked together from the time Higgins returned from West Burlington until his retirement in 2010. During this time, Dave Anderson ("Anderson") was their supervisor. At no time did Higgins complain to Anderson that his knee interfered with his ability to work or that he felt that his work was unsafe. Nevertheless, Higgins and Heckenberg allocated their job responsibilities between them to accommodate Higgins' knee problems beginning in 2005. Both Heckenberg and Anderson noticed Higgins' knee problems in 2005. Heckenberg saw Higgins limping and favoring one leg and offered him his choice of which part of the job he wanted to do to make it easier on Higgins.

In October 2009, Higgins' left knee was evaluated by Dr. Steven Potaczek, an orthopedic surgeon, who drained approximately 50 cubic centimeters of fluid from Higgins' knee. He was diagnosed as having chronic arthritis of both knees that people get as part of the normal aging process, with the left knee being worse than the right. Dr. Potaczek testified that he did not know what Higgins' job duties were on the railroad and that, irrespective of where he worked, he probably would have gotten arthritis anyway.

On March 26, 2010, Higgins saw another orthopedic surgeon, Dr. Joseph Martin. Dr. Martin diagnosed osteoarthritis of the left knee but had no opinion as to what caused the osteoarthritis; he had no knowledge of Higgins' job duties as a machinist or the length of time he performed those duties. After discussing both surgical and non-surgical options, Higgins decided to proceed with a left knee replacement on June 7, 2010. Post-operatively, in August and September 2010, Higgins had no complaints, with no pain and a full range of motion in his knee. Dr. Martin determined that Higgins could return to work on September 8, 2010. Higgins asserts that following his knee surgery, he was no longer able to perform his duties as a machinist.

Dr. Lonn Hutcheson, an expert in the areas of occupational and functional anatomy, conducted an in depth evaluation of Higgins' workplace and job duties at the BNSF diesel shop in Galesburg. Dr. Hutcheson concluded:

> The duties and tasks performed by Dennis Higgins, in my opinion, and to a reasonable degree of scientific certainty, were not unsafe, nor would it have been foreseeable by BNSF that Dennis Higgins was or would be at risk for the development of musculoskeletal disorder. If, in fact, putative occupational risk factors such as prolonged highly forceful activity, awkward posture, and highly repetitive activity are causally associated with the development of musculoskeletal disorders, the duties, tasks and activities that I have reviewed do not present a foreseeable risk for such disorders.

Another expert, Dr. Kurt Hegmann, opined:

> Mr. Higgins' job physical tasks appear to have involved minimal to minor amounts of kneeling and/or squatting. There is no epidemiological literature associating such minor amounts of kneeling and/or squatting with the development of knee arthritis. Mr. Higgins' non-occupational factors completely explain his condition. Thus, Mr. Higgins' knee arthritis and the need for a knee replacement is non-occupational and was not caused, aggravated, accelerated and/or contributed to by his occupational activities.

On March 1, 2012, Higgins brought this action alleging that his knee injuries were the result of negligence by BNSF in that they failed to provide him with a safe place to work, failed to provide adequate equipment, failed to provide safe methods of work, failed to provide adequate instructions, failed to warn of the dangers associated with cumulative trauma disorders, failed to properly evaluate the workplace for conditions and methods at risk for the development of cumulative trauma disorder, failed to educate on the risk of cumulative trauma disorder, failed to institute or develop a proper ergonomic program at the West Burlington shop, and assigned duties which BNSF knew or should

have known were beyond Higgins' capacity or which could otherwise aggravate his medical condition or cause injury to him. BNSF has moved for summary judgment, and this Order follows.

**LEGAL STANDARD**

A motion for summary judgment will be granted where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party has the responsibility of informing the Court of portions of the record or affidavits that demonstrate the absence of a triable issue. Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 2552 (1986). The moving party may meet its burden of showing an absence of material facts by demonstrating "that there is an absence of evidence to support the non-moving party's case." Id. at 2553. However, a plaintiff's uncorroborated testimony or subjective belief standing alone is insufficient to defeat a motion for summary judgment. Weeks v. Samsung Heavy Indus. Co., Ltd., 126 F.3d 926, 939 (7th Cir. 1997); Chiaramonte v. Fashion Bed Group, Inc., 129 F.3d 391, 401 (7th Cir. 1997). Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 2513 (1986); Cain v. Lane, 857 F.2d 1139, 1142 (7th Cir. 1988).

If the moving party meets its burden, the non-moving party then has the burden of presenting specific facts to show that there is a genuine issue of material fact. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S.Ct. 1348, 1355-56 (1986). Federal Rule of Civil Procedure 56(e) requires the non-moving party to go beyond the pleadings and produce evidence of a genuine issue for trial. Celotex Corp., 106 S.Ct. at 2553. This Court must then determine whether there is a need for trial -- whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may be reasonably resolved in favor of either

4

party. Anderson, 106 S.Ct. at 2511; Hedberg v. Indiana Bell Tel. Co., 47 F.3d 928, 931 (7th Cir. 1995).

**ANALYSIS**

FELA "provides a broad federal tort remedy for railroad workers injured on the job." *Crompton v. BNSF Railway Co.*, 745 F.3d 292, 296 (7th Cir. 2014). The statute provides in relevant part that:

> [E]very common carrier by railroad . . . shall be liable in damages to any person suffering injury while he is employed by such carrier . . . for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track . . . or other equipment.

45 U.S.C. § 51. Furthermore, although a plaintiff must prove the common law elements of negligence, namely foreseeability, duty, breach, and causation, in order to prevail, "a relaxed standard of causation applies under FELA." *Crompton*, 745 F.3d at 296, *citing CSX Transp., Inc. v. McBride*, 131 S.Ct. 2630, 2636 (2011). However, FELA is not a substitute for workers' compensation and does not make the employer an insurer. *Myers v. Illinois Central Railroad Co.*, 629 F.3d 639, 642 (7th Cir. 2010).

BNSF first challenges Higgins' ability to establish causation. Specifically, Defendant argues that there is no evidence establishing a causal relationship between his knee injuries and his specific duties for the railroad. Higgins responds that the arthritis condition in his left knee was aggravated by and became symptomatic as a result of negligence by BNSF in his workplace.

Where a layperson can easily determine what caused an injury, expert testimony is not required, but with a cumulative trauma injury such as the knee injury at issue in this case, which

refers not to one specific injury, but to numerous "wear and tear" disorders caused by the performance of repetitive work over a long period of time, "determining what caused it is not usually obvious to a layman and thus requires expert testimony." *Id.*, at 643. Here, Dr. Potaczek initially evaluated Higgins' knee in 2009, diagnosed chronic arthritis that men and women get as part of the normal aging process. (Potaczek Dep. At 7-11) He also opined, "irrespective of where he works or what have you, he probably would have gotten arthritis anyway. So I got it, you are going to get it, you are going to get it, he got it." *Id.* Dr. Martin also diagnosed osteoarthritis in the left knee and allowed Higgins to return to work without restrictions following his knee replacement in 2010. Dr. Martin knew nothing of Higgins' job duties and, even when such duties and conditions were described to him, did not believe that they impacted Higgins' osteoarthritis and did not express any opinion, to a reasonable degree of medical certainty, as to what caused his osteoarthritis.

There is also expert testimony from Dr. Hutcheson, who conducted an assessment of Higgins' working conditions and reviewed relevant medical records. Dr. Hutcheson then opined to a reasonable degree of scientific certainty that the duties, tasks, and activities associated with Higgins' job did not expose him to unsafe conditions or pose a foreseeable risk for the development of musculoskeletal disorders. Dr. Hegmann, a specialist in occupational medicine, reviewed Higgins' deposition, medical records, and other materials about Higgins and railroad work to support his opinion that there are no epidemiological studies associating the minimal amount of kneeling and/or squatting in Higgins' railroad occupation with a greater risk of arthritis or the development of arthritis; rather, Higgins' non-occupational factors (e.g., age, obesity, and bow-leggedness) completely explain his condition. Accordingly, Dr. Hegmann opined that the Higgins' arthritis and

need for a knee replacement was not caused, aggravated, accelerated and/or contributed to by his occupational activities.

Higgins attempts to recharacterize his injury as the aggravation of his pre-existing osteoarthritis and responds that Dr. Potaczek indicated that while not causing arthritis, particular job duties could make the condition become symptomatic. However, the testimony actually indicated that there was no direct correlation with railroad activity and that any kind of generic activity (e.g., cutting the grass, walking to the store, walking to the car, playing baseball) can make symptoms appear. (Potaczek Dep. at 15-17) Dr. Potaczek testified that arthritis symptoms are related to variables such as weight, activity, and age without direct correlation to occupation. *Id.*, at 15.

Higgins also cites testimony from Dr. Martin that Higgins' work activities were a component of the symptomatology and that repetitive lifting, bending, stooping, and climbing could contribute to and/or exacerbate arthritis. However, a review of this testimony does not support Higgins' suggestion that this activitiy was a cause of his arthritis. Rather, the portion of the transcript being referred to is as follows:

> Q. I would ask you to assume, Doctor, that on a daily basis Mr. Higgins was walking on uneven, rocky surfaces, which is commonly referred to on the railroad as ballast, that he was climbing on and off locomotives on a daily basis, six steps up on metal steps 16 times a day and that in regard to other job duties he had, was bending and squatting on a regular basis, replacing parts on locomotives and railroad cars and that he worked in what is commonly referred to as a pit, which is a concrete surface where he would be underneath an engine, squatting and inspecting engines for the railroad.
>
> In regard to those activities, do you have an opinion based upon a reasonable degree of medical certainty that that was a component of the symptomatology that he developed while working for the railroad?

* * *

> A. A component of the symptomatology, if that means would that cause him pain, I think that's reasonable, yes.

(Martin Dep. at 20-21) Thus, while Dr. Martin stated that certain activities like those suggested by Higgins' attorney could contribute to or exacerbate arthritis, he refused to opine with any degree of certainty that such activities could be the primary cause of osteoarthritis and stated his lack of awareness of any definitive relationship between repetitive activity and osteoarthritis. *Id.*, at 21-23. When the activities were subsequently clarified, Dr. Martin indicated that the type of climbing Higgins had to do would not qualify as the kind of "high-impact" activity that could potentially increase the amount of joint wear in a worker and that the size of the ballast walked on would make a difference as well. *Id.*, at 24-28

The only other evidence identified by Higgins in support of causation is his own testimony that his knees were sore when he went home after work and the testimony of his co-worker, Heckenberg, that the work was physically demanding. This does not constitute expert testimony. At best, Higgins has pointed to testimony suggesting that certain activities could exacerbate arthritic conditions; he has not cited any expert testimony establishing that the actual conditions of his work environment did so in this case or otherwise tying his working conditions to his injuries. Thus, Higgins has failed to introduce any expert testimony to create a genuine issue of material fact as to the causation of his osteoarthritis, which is required in this Circuit. *Myers*, 629 F.3d at 643, *citing Wills v. Amerada Hess Corp.*, 379 F.3d 32, 46-47 (2nd Cir. 2004); *Claar v. Burlington N.R.R. Co.*, 29 F.3d 499, 504 (9th Cir. 1994) (noting that "expert testimony is necessary to establish even that small quantum of causation required by FELA.")

Even less of a showing has been made of any evidence indicating that by requiring Higgins to perform his basic job duties, BNSF exposed him to an unsafe work environment or was otherwise negligent. Under FELA, the employer has a duty to use reasonable care in providing employees with a safe workplace. *Holbrook v. Norfolk Southern Railway Co.*, 414 F.3d 739, 742 (7th Cir. 2005). Dr. Hutcherson opined that he found no unsafe conditions in Higgins' work environment. Higgins offers no evidence to rebut this finding. Other than the bald statements that he was not offered knee pads or knee mats and the conclusory assertion that he "has a sufficient dispute as to . . . the negligence elements as alleged to proceed to a jury determination of liability in this case," Higgins has identified no evidence sufficient to promote the reasonable inference of negligence by BNSF in this case. (Higgins' Response at 6) It is not sufficient to sit back and rely on the allegations of the complaint at summary judgment.

The Seventh Circuit has stated, "We often call summary judgment the 'put up or shut up' moment in the litigation, by which we mean that the non-moving party is required to marshal and present the court with the evidence [he] contends will prove [his] case. And by evidence, we mean evidence on which a reasonable jury could rely." *Porter v. City of Chicago*, 700 F.3d 944, 956 (7th Cir. 2012); *see also,* Fed. R. Civ. P. 56. "Conclusory allegations, unsupported by specific facts, will not suffice." *Id.*, at 956, *citing Payne v. Pauley*, 337 F.3d 767, 772-73 (7th Cir. 2003). As Higgins has failed to put forth evidence from which a reasonable jury could conclude that his work environment was unreasonably unsafe or that BNSF failed to exercise reasonable care for his safety, summary judgment is appropriate on this element, as well.[1]

---

[1] Higgins also fails to respond with any evidence refuting the expert testimony that BNSF had no reason to foresee that his job duties in servicing locomotives would cause him to develop knee degeneration or osteoarthritis.

9

Finally, BNSF contends that Higgins filed his lawsuit after the period of limitations because it was filed more than three years from the time that he believed or should have believed that his work was causing serious physical deficits in his left knee. Specifically, BNSF notes that the Complaint in this matter was filed on March 1, 2012, while Higgins clearly suffered from his osteoarthritis prior to 2009. Heckenberg also testified that Higgins' knee problems were obvious to him when he returned to work in Galesburg in 2005.

"At some point, persons with degenerative conditions have a duty to investigate the cause." *Tolston v. National Railroad Passenger Corp.*, 102 F.3d 863, 866 (7th Cir. 1996). That being said, the Court need not determine whether Higgins' Complaint was timely given the findings that he has failed to raise a genuine issue of material fact requiring resolution at trial as to causation, negligence by BNSF, or foreseeability of his injuries. BNSF is therefore entitled to summary judgment.

## CONCLUSION

For the reasons set forth above, Defendant BNSF's Motion for Summary Judgment [31] is GRANTED. This matter is now terminated, and any existing deadlines are vacated.

ENTERED this 10th day of June, 2014.

s/ James E. Shadid  
James E. Shadid  
Chief United States District Judge